IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of J.S., | ) | No. 80989-0-I |
| | ) | |
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| J.S., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — J.S. appeals a 14-day involuntary commitment order. He argues the evidence was insufficient to support the court's findings that he presented a risk of harm to others and was gravely disabled. J.S. also contends he did not receive notice of the allegations against him for commitment. We disagree and affirm.

FACTS

J.S. has been diagnosed with schizophrenia. He visited several hospitals in early December 2019, complaining "I was given meds that messed with my head [and] I feel like I'm going to snap." During these hospitalizations J.S. appeared agitated, yelled at staff, reported "hearing voices," and stated he had not eaten in days and could not remember the last time he slept.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

J.S.'s mother, Tracy,[1] resided in St. Louis, Missouri at the time and spoke to J.S. three to four times a week on the phone. On December 22, Tracy arrived in Seattle for the purpose of taking J.S. back to St. Louis, but J.S. was hospitalized for psychiatric treatment at the time. After J.S. was released from the facility on December 24, Tracy transported him to a relative's house and stayed with him "the whole time" thereafter.

According to Tracy, when J.S. is doing well he is calm, quiet, uses logic and complete sentences, takes care of his personal hygiene, sleeps well, and eats. Despite his release from treatment, Tracy felt J.S. "still needed medication" because he had mood swings that resulted in angry outbursts and said "stuff like the beds [are] watching him."

On December 26, Tracy saw J.S. become aggressive and nearly get into a fight with his brother and uncle. Two days later, Tracy took J.S. to St. Francis Hospital, where he was quickly discharged. When Tracy retrieved J.S. in her car, J.S. was angry and demanded she take him to a dispensary. Tracy refused J.S.'s instruction as it was nearly midnight and J.S.'s behavior escalated. At that point J.S. began "bamming" and "banging" on the dashboard, angrily saying "take me where I want to go," and threatened to jump out of the car. Alone in the car with J.S., Tracy "felt threatened" by his escalating behavior and inability to control "his temper." J.S. then exited the car while it was still moving and Tracy pulled over to call for help.

---

[1] We refer to J.S.'s mother by first name only to protect his privacy interests and mean no disrespect by doing so.

Mary Tetrault, a designated crisis responder, listened to Tracy's concerns about J.S. and why she felt hospitalization was necessary for J.S.'s safety and stability. Tetrault then prepared a declaration memorializing Tracy's statements during the conversation.

On December 30, 2019, Kent Police Officer V.M. Alatorre responded to a domestic dispute call involving J.S. threatening family members with a knife. Tracy informed the officer that J.S. had "a history of schizophrenia but does not take his medications," J.S.'s behavior had become "increasingly aggressive" over several days, and J.S. had made "threats to harm others and destroy the world." Alatorre transported J.S. to Valley Medical Center for a mental health evaluation and completed a police department involuntary commitment form.

Charlotte Jones, an emergency room crisis counselor at Valley Medical Center, prepared a declaration summarizing her encounter with J.S. that day. Jones noted that J.S. "is schizophrenic and has not been taking his meds," heard J.S. make "threats such as, 'I'm going to hurt yawl; I'm done playing; we can do this the easy way or the hard way,'" and received the following response when she asked why J.S. was not taking his medication: "I am not going to take medication for the rest of my life like my dad."

Grace Mussa, another designated crisis responder, also evaluated J.S. at Valley Medical Center. After reviewing the police report, Jones' declaration, speaking with Tracy, and meeting with J.S., Mussa concluded that as a result of a mental disorder J.S. "is at imminent risk of harm and is gravely disabled." Mussa then completed a detailed petition for initial detention providing for J.S.'s 72-hour

evaluation and treatment at an available facility. Mussa supported this petition with the declarations of Jones, Tetrault, and the police report.

The next day, J.S. was admitted to Cascade Behavioral Health for treatment. Immediately, practitioners at Cascade Behavioral Health filed a petition for 14 days of involuntary treatment, along with the petition for initial detention. The 14-day petition alleged that J.S. presented a likelihood of serious harm to himself, to others, and was gravely disabled, based on the following allegations:

> The respondent [J.S.] suffers from a mental, cognitive, or organic disorder as evidenced by paranoia, delusions, agitation, aggression, poor impulse control, and impaired insight and judgment. Prior to hospitalization, on 12/30/19, the respondent was brought to the [emergency department (ED)] by Kent police after his mother [reported he] made threats to harm others and destroy the world. His mother also informed the [designated crisis responder (DCR)] that the respondent has been increasingly agitated, escalated, violent, laughing in appropriately, [sic] trying to fight people, and acting oddly. She also reported that he is not taking his medication as prescribed. In the ED, the respondent spoke in a word salad manner, was pressured, disorganized, agitated, pacing, and making vague threats such as "I'm going to hurt y'all." He refused medications and stated "I'm not going to take medications for the rest of my life like my dad" and refused voluntary hospitalization. He was slamming his bed, hitting his head on the wall, and required 4 point restraints and IM[2] Zyprexa and Ativan due to his behaviors. It is also noted that the respondent eloped from St. Francis ED on 12/29/19 and Kent PD quickly located him.

On January 2, 2020, the court held a probable cause hearing. The State called Tracy, Dr. Bethany O'Neill (a records custodian for Valley Medical Center), and Clair Coetzer (a licensed clinical social worker at Cascade Behavioral Health) to testify in support of the petition. J.S. testified in opposition the petition and asked to be released. The court found J.S. presents a likelihood of serious harm to others

---

[2] Intramascular.

and is gravely disabled as a result of a mental disorder. The court also determined less restrictive treatment was not in the best interests of J.S. or others, and ordered J.S. be detained at Cascade Behavioral Health for a period not to exceed 14 days. The court also denied J.S.'s subsequent motion for reconsideration. J.S. appeals only the order of commitment.[3]

## ANALYSIS

J.S. asks us to vacate the order of commitment on two grounds. First, he argues there was insufficient evidence that he posed a likelihood of serious harm to others and was gravely disabled. Second, he contends the petition did not provide notice of the majority of allegations on which the court relied for its ruling.

## I.    Sufficiency of Evidence

A court may order a person held for up to 14 days of involuntary treatment when the State demonstrates by a preponderance of the evidence that the person "presents a likelihood of serious harm, or is gravely disabled" as a result of a "mental disorder."[4] Former RCW 71.05.240(3)(a) (2019); In re Det. of W.C.C., 193 Wn. App. 783, 785–86, 372 P.3d 179 (2016).

We review the trial court's decision in an involuntary commitment proceeding to determine whether substantial evidence supports the findings of fact and whether those findings in turn support the court's conclusions of law. In re

---

[3] J.S.'s 14-day commitment has expired. We reach the merits of this appeal, however, because civil commitment orders under chapter 71.05 RCW have collateral consequences in subsequent petitions and hearings. In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012).

[4] A "mental disorder" is an organic, mental, or emotional impairment that "has substantial adverse effects on a person's cognitive or volitional functions." Former RCW 71.05.020(37) (2019).

Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998). "The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." Id. (citing Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wn.2d 935, 939–40, 845 P.2d 1331 (1993)).

We defer "to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014) (citing Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003); Burnside v. Simpson Paper Co., 123 Wn.2d 93, 108, 864 P.2d 937 (1994)).

A.    Likelihood of Serious Harm to Others

J.S. argues the State failed to present substantial evidence he was a serious threat to hospital staff or to his mother. We disagree in part.

A "[l]ikelihood of serious harm" means "[a] substantial risk" of physical harm to self, others, or property of others. RCW 71.05.020(35)(a). For a finding of substantial risk of harm to others, the State must demonstrate "behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." RCW 71.05.020(35)(a)(ii).

Here, the trial court initially found that J.S. suffers from schizophrenia. J.S. does not assign error to this finding and does not otherwise challenge the evidence supporting it. Thus, this finding becomes a verity on appeal. W.C.C., 193 Wn.

App. at 793 n. 5 (citing State v. Gibson, 152 Wn. App. 945, 951, 219 P.3d 964 (2009)).  Next, the trial court found that,

> as a result of his mental impairment, the respondent [J.S.] was [sic] a likelihood of serious harm to others based on evidence of the respondent's mother's fear when the respondent was in her car, yelling and banging on her dashboard, as well as evidence in the hospital of the respondent attempting to punch a nurse, requiring a staff response of over ten people to restrain the respondent, an incident that included the police being called, and repeated examples in the hospital of the respondent indicating he would fight those around him.  The Court found the testimony of [Tracy], the respondent's mother, credible when she described feeling threatened in her car and inferred from evidence of police and staff response to the respondent's agitation in the hospital as indicating staff's fear due to the respondent's behavior.

While J.S. is correct that there is nothing in the record to show that the hospital staff "feared" for their own safety, which means the State failed to carry its burden to support as to the hospital staff,[5] the findings as to the mother's fear are supported by substantial evidence.  Tracy testified she "felt threatened" when J.S. was banging on the dashboard of her car and the court determined her testimony was credible.

This evidence supports the finding that J.S. had placed his mother in reasonable fear of serious physical harm.  Accordingly, the findings of fact support the trial court's conclusion that J.S. presented a likelihood of serious harm to others.  There was no error.

---

[5] None of the hospital staff testified or submitted declarations articulating such fears. In the absence of evidence that the individual to whom the behavior was directed was "personally in fear that he or she would be harmed in the manner threatened," as in this case, we have held that the State did not establish a "likelihood of serious harm" to others. In re Det. of D.V., 200 Wn. App. 904, 907–08, 403 P.3d 941 (2017).

    B.    Gravely Disabled

    J.S. next contends substantial evidence does not support the finding that he was gravely disabled, because the State failed to present recent proof of deterioration of his routine functioning and the court made no finding that he would not receive essential care if released. We disagree.

    A person is "[g]ravely disabled" as a result of a mental disorder, under RCW 71.05.020(23)(b), when he or she "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." To meet its burden of establishing an individual is "gravely disabled" under subsection (b), the State's "evidence must include recent proof of significant loss of cognitive or volitional control." LaBelle, 107 Wn.2d at 208. The State's evidence must also "reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." Id.

    Here, after orally noting that J.S. "indicated that he is unlikely to take medications . . . if released," the trial court found him "gravely disabled under prong (b)" as he "manifested a severe deterioration in his routine functioning evidenced by repeated and escalating loss of cognitive and volitional control over his actions and that he was not receiving such care as was essential for his health and safety."[6]    The court also found J.S. was unlikely to follow an order to take

---

[6] "An appellate court may consider a trial court's oral decision so long as it is not inconsistent with the trial court's written findings and conclusions." State v. Kull, 155 Wn.2d 80, 88, 118 P.3d 307 (2005) (citing State v. Bryant, 78 Wn. App. 805, 812–13, 901 P.2d 1046 (1995)). We

medication "based on his own admissions as to his need for medication." Because the record demonstrates that the court concluded J.S. would not receive essential care in the form of medication if released, we reject his argument as to a lack of a specific finding on that issue.

The record also demonstrates that Tracy had an adequate basis to discuss the changes she observed in J.S. over the course of December 2019. Tracy testified to talking with J.S. about "three or four times a week over the phone" before coming to Seattle in December 2019 and spoke about being with J.S. "the whole time" after her arrival. The court found J.S.'s condition had "deteriorated based on his mother's testimony that, when he is well, [he] is quiet, logical, able to speak in complete sentences, not aggressive or hostile, and sleeps well," which "stood in contrast to his presentation leading up to hospitalization, including mood swings, issues sleeping, paranoia, and aggression." We find that the court had recent evidence of J.S.'s deterioration to support its findings that he was gravely disabled.

II.    Adequacy of Notice

J.S. claims the petition for 14-day commitment did not state all of the factual allegations the trial court relied upon for its ruling and, consequently, he received insufficient notice of the proceedings. Again, we disagree.

Involuntary commitment is a "massive curtailment of liberty" that requires due process protections and notice requirements be strictly construed. Humphrey

---

determine no inconsistency exists between the trial court's oral ruling and written order here. So, we consider the oral ruling in our analysis.

v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); In re Det. of Cross, 99 Wn.2d 373, 382, 662 P.2d 828 (1983). A copy of the petition for 14-day commitment must be "served on the detained person . . . prior to the probable cause hearing." Former RCW 71.05.230(5) (2019). The petition must "state facts that support the finding that such person" presents a likelihood of serious harm or is gravely disabled as a result of a mental disorder. Id. at (4)(b). Notice is adequate when a petition indicates the issues the State will address at the hearing. Cross, 99 Wn.2d at 382 (the general purpose of providing notice is to "apprise the affected individual of, and permit adequate preparation for, an impending hearing").

J.S. argues the "court's factual findings relied almost entirely on the new allegations offered at trial but not raised in the [14-day commitment] petition."[7] However, a comparison of the petition and the court's order of commitment reveals adequate notice was provided here.

The petition set forth the symptoms of J.S.'s schizophrenia diagnosis, summarized the events leading up to J.S.'s detention at Valley Medical Center, spoke of J.S.'s increasingly angry and threatening behavior, and reported that J.S. had refused medications stating: "I'm not going to take medications for the rest of my life like my dad." Similarly, the court's order of commitment relied on evidence of (1) a schizophrenia diagnosis, (2) J.S.'s mother feeling threatened by his actions

_____

[7] Specifically, J.S. claims the State presented evidence of "factual allegations not raised in the petition," including,

> [T]estimony related to (1) the incident in J.S.'s mother's car where J.S. banged on the dashboard and demanded to be taken to the dispensary, (2) J.S.'s prior emergency room visits at Valley Medical Center on December 5–7 and December 18–19[,] (3) police being called to assist staff at Valley Medical Center with restraining and medicating J.S. on December 30, and (4) J.S.'s behavior at Cascade after the 14-day petition was filled, including that he attempted to punch another nurse and threatened to fight other patients.

in her car, and (3) J.S.'s refusal to take medications as prescribed. The court's order did not rely on the other items of which J.S. now complains. The notice complied with due process.

Affirmed.

WE CONCUR:

Chun, J.

Appelwick, J.